UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

GIOVANTE PENDELTON,

    Plaintiff,

    v.           Case No. 24-cv-1579-scd

JAMES BRUNO,

    Defendant.

## DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Giovante Pendelton, who is representing himself, is proceeding on an Eighth Amendment deliberate indifference claim against Defendant James Bruno. He asserts that Bruno failed to provide adequate medical care for Plaintiff's intestinal problems between August 26, 2024 and September 13, 2024 after he ate something in the Restrictive Housing Unit (RHU) at the Green Bay Correctional Institution. ECF Nos. 1 & 9. On November 24, 2025, Defendant filed a motion for summary judgment. ECF No. 26. Because no reasonable jury could conclude that Defendant was deliberately indifferent towards Plaintiff's medical condition, the Court will grant the motion for summary judgment and will dismiss this case.

## UNDISPUTED FACTS

At the relevant time, Plaintiff was an inmate at the Green Bay Correctional Institution, where Defendant James Bruno was a doctor. ECF No. 28, ¶¶1 & 2. Plaintiff has a long history of gastrointestinal problems. *Id*., ¶¶9, 16, & 37. Plaintiff had multiple colonoscopies as a child; multiple polyps removed prior to incarceration; a history of hemorrhoids; a cholecystectomy in 2014; and a significant history for "perirectal abscess status post-incision and debridement" in

2019.  *Id*., ¶¶16 & 37.  A cholecystectomy is a surgery to remove the gallbladder, an organ that collects and stores bile.  *Id*., ¶17.  Once the gallbladder is removed, it becomes difficult for the body to digest fatty foods because bile continuously flows into the intestines (instead of a concentrated release), causing a fatty food intolerance.  *Id*., ¶18. Long-term side effects of a cholecystectomy can include abdominal pain, nausea, bloating, gas, diarrhea, and indigestion.  *Id*., ¶¶17 & 18.

In November 2023—about nine months prior to the events giving rise to this lawsuit—Plaintiff filed several Health Service Requests (HSRs) complaining about bloody stool.  *Id*., ¶¶10, 12, & 14. In response, nursing staff scheduled three different same-day Nurse Sick Call appointments; ordered a stool sample (a hemoccult test); recommended increased water intake and light exercise; and referred Plaintiff to an Advanced Care Provider (ACP).  *Id*., ¶¶10-15.  On November 14, 2023, Plaintiff saw the ACP—Dr. Barry Daughtry (not a defendant)—to review the stool sample findings.  *Id*., ¶16.  The hemoccult test was positive for the presence of blood in the stool sample.  *Id*.  Dr. Daughtry ordered additional testing including, a Comprehensive Metabolic Panel (CMP), a Complete Blood Count (CBC), and a plan to do a colonoscopy if the results of the CBC showed Plaintiff was anemic.  *Id*., ¶19.  On November 29, 2023, Plaintiff received a prescription medication (Gelsol) for complaints of stomach pain.  *Id*., ¶22; *see also* ECF No. 30-1 at 39.

Dr. Bruno first became involved with Plaintiff's medical care on April 30, 2024 for a routine follow-up from his November 2023 appointment.  ECF No. 28, ¶23.  During that appointment, Plaintiff reported that his bloody stools had resolved, so Dr. Bruno did not order any further treatment or evaluation at the time.  *Id*.  Dr. Bruno noted that the plan of care from

November 2023 was to do a colonoscopy, if the CBC results showed a need, but Plaintiff's Hgb was 14.7 (normal), so a colonoscopy was not required at the time. *Id*.

About three months later, in July 2024, Plaintiff filed an HSR regarding bloating and difficulty passing bowel movements. *Id*., ¶24. Plaintiff received a same-day Nurse Sick Call appointment, where the nurse examined Plaintiff, ordered Ibuprofen, and told him to drink more water and exercise to help with constipation. *Id*., ¶¶24 & 25; ECF No. 30-1 at 36. Plaintiff had reported only drinking two cups of water per day. ECF No. 30-1 at 35. The nurse also sent a message to the ACP for a possible long-term order for Mintox. *Id*. at 36.

About a month later, on August 19, 2024, Plaintiff filed an HSR complaining about stomach pain and blood in his stool. ECF No. 28, ¶26. Plaintiff received a same-day Nurse Sick Call appointment, where the nurse examined Plaintiff, ordered Ibuprofen for pain, asked for another stool sample to see if things had changed since the last stool sample, and contacted Dr. Bruno for further guidance. *Id*., ¶29. Plaintiff declined the stool sample. *Id*. Dr. Bruno later ordered a CBC lab to determine the extent of blood loss from the bloody stools. *Id*., ¶30; ECF No. 30-1 at 27.

About a week later, on August 26, 2024, Plaintiff filed another HSR stating that he had daily diarrhea and bloody stool. ECF No. 28, ¶31. Plaintiff's lawsuit involves the time period following this HSR. *See* ECF No. 1. In response to the August 26 HSR, Plaintiff received a same-day Nurse Sick Call appointment, where the nurse examined Plaintiff, advised him of his upcoming CBC lab work to check for the extent of blood loss, and placed a referral to Dr. Bruno. ECF No. 28, ¶32. Three days later, on August 29, 2024, Plaintiff had another in-person medical appointment after which Dr. Bruno ordered Loperamide four times a day for diarrhea. *Id*., ¶33.

3

On September 3, 2024, Plaintiff had another in-person medical appointment for bloody diarrhea and stomach pain. *Id*., ¶34. He reported that the Loperamide was working except when he wakes up in the morning. *Id*. The nurse advised Plaintiff that he had labs scheduled on September 6, 2024; and an appointment with an ACP on September 9, 2024. *Id*.

On September 7, 2024, a nurse went to RHU to examine Plaintiff after a correctional officer reported that Plaintiff was in pain and had bloody diarrhea. *Id*., ¶35. Plaintiff told the nurse that he had eaten peanuts from the Canteen; and the nurse educated Plaintiff that the oils from peanuts can cause diarrhea in individuals who do not have a gallbladder. *Id*. The nurse called Dr. Smith, who ordered Pepto-Bismol, Omeprazole (an antacid), and a CBC lab. *Id*.

On September 9, 2024, Plaintiff did his blood draw for the CBC lab. *Id*., ¶36. The results showed that Plaintiff had slightly elevated platelets, slightly elevated absolute monocyte count (white blood cells from infections), and an elevated absolute eosinophil count (white blood cells from allergic reactions). *Id*. The remainder of the CBC lab was within normal range. *Id*. The following day, on September 10, 2024, Plaintiff saw Dr. Bruno for an appointment. *Id*., ¶37. In response to the elevated CBC results, Dr. Bruno ordered: (1) an x-ray of Plaintiff's abdomen; and (2) a stool sample to test for (a) occult blood; (b) pancreatic elastase; (c) calprotectin; and (d) fat stain. *Id*.

Two days later, on September 12, 2024, Plaintiff completed an x-ray and gave a stool sample in the afternoon. *Id*., ¶¶38 & 39. The x-ray found "no definite or specific acute abdominal finding" but recommended "repeat radiographs or a CT if symptoms persist or worsen." *Id*., ¶41. Later in the day, on September 12, 2024 at around 5:23 p.m., security staff called HSU to report that Plaintiff was experiencing abdominal pain. *Id*., ¶40. Plaintiff was taken to the HSU, where

4

he appeared in "moderate distress." *Id*. The nurse called Dr. Bruno, who ordered a 60mg Ketorolac injection for pain relief along with a liquid diet. *Id*.

The following day, on September 13, 2024 at around 7:40 a.m., security staff called HSU to report that Plaintiff was coughing up blood. *Id*., ¶45. Plaintiff was immediately taken to HSU, where nursing staff called Dr. Bruno, who ordered that Plaintiff be sent to the Emergency Room (ER). *Id*., ¶¶46 & 47. At the ER, medical staff ordered a stool sample and CBC labs—as Dr. Bruno had previously ordered—and ordered a CT scan—as had been recommended by the x-ray finding the previous day (which Dr. Bruno had not yet reviewed because he was off duty). *Id*., ¶¶48-52. Following the CT scan, Plaintiff was diagnosed with colitis. *Id*., ¶52. Colitis is an inflammatory bowel disease that causes abdominal pain, cramping, diarrhea, rectal bleeding, and bloating. *Id*., ¶53. ER staff suspected that Plaintiff had infected colitis, so they ordered antibiotics. *Id*., ¶54. They noted that Plaintiff was already prescribed pain and nausea medication from institution staff. *Id*. They also recommended a soft diet and a referral to gastroenterology for additional colitis investigation. *Id*. Dr. Bruno ordered everything that was recommended by the ER and he renewed the prescriptions for the pain and nausea medication. *Id*., ¶56.

In September 2024, Plaintiff complained of abdominal pain, coughing up small amounts of blood, and nausea. *Id*., ¶¶57 & 58. Plaintiff's medical chart showed that he was not regularly taking his medication as prescribed. *Id*., ¶59. Dr. Bruno then sent Plaintiff a letter on October 2, 2024 explaining that he had to take all of his prescribed medication to control his symptoms. *Id*., ¶60. Dr. Bruno was not involved in Plaintiff's treatment after October 2, 2024. *Id*., ¶68.

On October 9, 2024, Plaintiff saw Dr. Kwabena Adu-Gyamfi (not a defendant) at the Prevea St. Mary's Health Center's Gastroenterology Department. *Id*., ¶62. Dr. Adu-Gyamfi recommended an esophagogastroduodenoscopy (EGD) and colonoscopy with biopsies. *Id*., ¶63.

5

On November 20, 2024, Dr. Chaitanya Pant (not a defendant) completed an EGD and colonoscopy on Plaintiff. *Id*., ¶65. Dr. Pant concluded that Plaintiff had both H. pylori gastritis as well as inflammatory bowel disease, probably Crohn's. *Id*., ¶66. Dr. Pant suggested treating the Crohn's first then treating the H. pylori gastritis. *Id*. Dr. Pant wrote, "I would recommend that he be started on 40mg of prednisone every day for 4 weeks and then decrease prednisone by 10mg daily until off. In the meantime he should have a return appointment with one of our nurse practitioners to be assessed for Remicade." *Id.* HSU staff accepted the recommendation and prescribed Prednisone and the follow-up appointments. *Id*., ¶67.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co*., 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

To survive summary judgment on an Eighth Amendment deliberate indifference claim, Plaintiff must provide evidence from which a reasonable jury could conclude that: (1) he faced an objectively serious medical condition; and (2) Defendants subjectively knew about the medical condition and disregarded it. *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (citing *Arnett v. Webster*, 658 F.3d 742, 750, 751 (7th Cir. 2011)). The first, objective, element is satisfied by showing that Plaintiff suffered from a condition "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (citing *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008)). The second, subjective, element is satisfied by showing that a prison official "knows of a substantial risk of harm to an inmate and 'either acts or fails to act in disregard of that risk.'" *Gomez*, 680 F.3d at 865 (quoting *Arnett*, 658 F.3d at 750). This is a "high hurdle." *See Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012). It requires "something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Id*. (quoting *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006)). Plaintiff must show that Defendants' decision was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008) (quoting *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998)).

In the prison medical care context, examples of deliberate indifference can include: (1) ignoring a request for medical assistance; (2) refusing to take instructions from a specialist (3) persisting in a course of treatment known to be ineffective; (4) choosing an easier and less efficacious treatment without exercising medical judgment; and (5) delaying in treatment which

7

serves no penological interest. *Petties v. Carter*, 836 F.3d 722, 728-31 (7th Cir. 2016). The Court examines the totality of an inmate's medical care when analyzing deliberate indifference. *See Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997).

The Court will presume for purposes of this motion that Plaintiff's abdominal pain and bloody diarrhea for three weeks was an objectively serious medical condition. But no reasonable jury could conclude that Dr. Bruno was deliberately indifferent towards it. In response to Plaintiff's complaints, Dr. Bruno conducted a GI examination and ordered: (1) a CBC test to determine the extent of blood loss from the bloody stool, (2) Loperamide for diarrhea, (3) an x-ray of the abdomen, (4) a stool sample, (5) a 60mg Ketorolac injection for pain management, (6) a liquid diet, and ultimately (7) a trip to the ER. He also ordered everything the ER doctors recommended for treatment. And Plaintiff also had a prescription for Ibuprofen, Pepto-Bismol, an antacid, and an anti-nausea medication from other medical care providers. Based on this record alone, no reasonable jury could conclude that Dr. Bruno was deliberately indifferent towards his medical condition.

Plaintiff's main argument in response is that Dr. Bruno "delayed" treatment. ECF No. 37 at 15-20. Plaintiff appears to believe that he should have been sent to the ER (or to a specialist) immediately on August 26, 2024 when he initially complained about stomach pain and bloody diarrhea; and this would have saved him from three weeks of pain and discomfort. But Dr. Bruno used his medical judgment in determining that conservative treatment options at the institution should be attempted before an ER visit. Plaintiff's disagreement with the use of his medical judgment does not show deliberate indifference. *See Chadwick v. Walker*, 365 F. App'x 687, 690 (7th Cir. 2010) ("[D]isagreement with the exercise of medical judgment does not state a claim for deliberate indifference.") The Court notes that Dr. Bruno had ordered as his treatment plan

everything the ER doctors also ordered—*i.e.*, the CBC test, a stool sample, pain medication, antinausea medication, and a liquid/soft diet. The x-ray Dr. Bruno had ordered suggested a CT scan, but Plaintiff was sent to the ER before Dr. Bruno could review the results of the x-ray. Ultimately, the CT scan is what helped the ER doctors diagnose Plaintiff with Colitis; and a CT scan likely would have been Dr. Bruno's next step had he had the opportunity to review the x-ray results before the ER visit. Based on these circumstances, no reasonable jury could find that Dr. Bruno's treatment plan was such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that he actually did not base the decision on such a judgment.

Plaintiff complaints that everyone kept telling him "nothing was wrong with me" when he knew something was wrong. ECF No. 37 at 7, 10, & 19. But even if people had said that or had implied that, they did not *act* as though nothing was wrong. To the contrary, they kept scheduling in-person examinations, ordering different types of medications, and ordering different types of diagnostic testing. While Plaintiff may have felt frustrated with people's words or the pace of treatment, he was not treated with deliberate indifference.

In sum, it is unfortunate that it took three weeks to diagnose Plaintiff with Colitis. But, to put things in perspective, individuals who are not in custody often have to wait much longer than that to even get a routine medical appointment in the first place. An appointment with a specialist—as Plaintiff had immediately wanted on August 26—can often take months. Plaintiff, on the other hand, had nine in-person medical appointments (August 26, August 29, September 3, September 7, September 9, September 10, September 12 (twice), and September 13) during a three-week period of time where treatment started with over-the-counter medications, such as Ibuprofen, Pepto-Bismol, an anti-diarrheal, an antacid, and anti-nausea medication, and escalated to more

potent medication, such as an injection for pain relief. Plaintiff also received diagnostic testing, including an x-ray, a stool sample, and CBC labs, during that time. Based on the totality of the record, no reasonable jury could conclude that Dr. Bruno was deliberately indifferent towards Plaintiff's medical condition. Therefore, Dr. Bruno is entitled to summary judgment and the Court will dismiss this case.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant's motion for summary judgment (ECF No. 26) is **GRANTED**; and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 12th day of May, 2026.

_____
STEPHEN C. DRIES
United States Magistrate Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $605.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.